Tucker, P.
I think it abundantly clear, that the ap- ■ pellants are not entitled to relief, on the ground of the superiour title of the M’Knights to a portion of the tract comprehended, as it is said, within the boundaries set forth in Brawford’s deed to Keyton. Admitting the right of a party to injoin the payment of purchase money, upon proving an actual outstanding superiour title in another, which seems now to be the well established principle of our courts (3 Rand. 44.) I am well satisfied, that there is no such ground for relief in this case, because the vendor never contemplated gelling that portion of land, which lies within the boundaries claimed by the M’Knights.
It sufficiently appears, that the dispute between David and James Trimble and George M’Knight, which was the subject of the suit brought by M’Knight against them in the general court in 1773, was compromised by the agreement between M’Knight and John Trimble of May 1781. {Here the president stated the circumstances on which he founded his opinion on this point). Thenceforth, ever since, the parties have held by the lines as settled by that compromise ; and from that time, the grant to David Trimble of *47 October 1765, must be taken to have been limited by those lines; for this court has decided, that the agreed boundaries between parties shall be sacredly respected, as the real and true boundaries of their lands, whatever evidence may be offered to the contrary.
Such being the established boundary of Trim,ble’s grant, we are told by the bill, that it was the object of John Trimble’s executors, in 1804, to convey to Steele and Brawford, all the land which David Trimble had owned &c.; that Keyton purchased Brawford’s moiety of the land so conveyed, and that Brawford intended to convey such moiety; but that the land was altogether in woods, when the deed was made by Trimble’s executors to Steele and Brawford, the boundaries and title papers were in a great measure unknown to the parties, and thus the description of the boundaries in that deed, was altogether erroneous. Now, it is true, that the bill does not expressly assign the embracing of M’Knight’s lands in the courses of the deed, as one of the errors committed; but they shew, that the parties were in a state of ignorance as to the boundaries, which led to the mistaken description; and it is now ascertained, that their grossest mistake was in comprehending lands which had, more than twenty years before, been given up as not within their boundary. I am, therefore, well satisfied, that the deed from Trimble’s executors to Steele and Brawford, and that from Brawford to Keyton, are both erroneous, in this particular; and as Key lords representatives come here to ask equity, they must submit to the correction of that error; and the rather, if Keyton was well acquainted with the title, and had the deed prepared which was afterwards executed by Brawford and wife.
The next ground on which relief is asked, is the alleged deficiency in the quantity of the land sold. This depends upon the question, whether the sale was in gross or by the acre; for if it was a contract of hazard, in which each party took upon himself the risk of excess or deficiency, there can be no relief afforded to either, whatever may be the actual quantity in the tract sold.
*48 Questions of this character have frequently been before this court, and nothing is better established than the law of the subject, when the real intention of the parties in the contract, is once ascertained. But this intention it is sometimes difficult to discover, from the carelessness of the parties, from the use of equivocal expressions, and from the glosses which are given to the transaction by the testimony of witnesses.
Before going into an examination of the probable intention of the parties, in this case, I shall premise a few remarks on the subject. Contracts of hazard, such as those we are now considering, never have been discountenanced by our law. Where they are clearly established, they are valid, and will be respected and enforced, if fair and reasonable. But, though such a contract of hazard is valid, it is not readily to be presumed, that the parties designed to enter into such a contract, unless it is clearly sustained by the facts. The courts will not favor such a construction; but they will rather take it, that a contract is by the acre, whenever it does not clearly appear, that the land was sold by the tract, and not by the acre; Hundley v. Lyons, 5 Munf. 342. Nor will they presume, that an executor, who ought not to sell in gross, has done so, unless the fact be clearly established; Jolliffe v. Hite, 1 Call 301. Nor do I think it should be readily presumed, that a vendee, who is ignorant of the lines and of the quantity of land, would enter into such a contract of hazard with the vendor, who may fairly be supposed to know every thing about it: since, in such a contract, the hazard is only on one side.
In the present case the deed itself and the circumstances, afford the only evidence of the character of this purchase. The deed is for a moiety of two tracts of land, the first con--tabling 325 acres, and the second containing 18 acres. Whether the specification of the number of acres here, should be regarded merely as matter of description, or in the stronger light of a warranty of quantity, may well, perhaps, admit of a difference of opinion. I have looked upon such mention of quantity, as, in general, matter of description only, and not of itself as giving the character of a contract *49 by the acre to the transaction. I am satisfied, that such a thing is rarely dreamed of by those who execute deeds, usually filled up according to a formula, without the slightest reference to the real contract of the parties.
In the present case, the circumstances are very strong to shew a purchase in gross, instead of by the acre. The presumption against a vendee’s being willing to make such purchase, is rebutted by the fact, that Keyton was himself interested in the estate, and probably knew as much or more of it than Brawford. The tract was in woods and unsettled : its lines were unascertained, and but little known to the contracting parties: the value by the acre was small: no previous attempt was made to ascertain the lines or quantity, and no provision for a survey, preparatory to a final adjustment of the purchase money, though the parties were very uninformed about the land: the conveyance was of 325 acres instead of 300, as set forth in the grant under which the land was claimed; whence I infer that an estimate of quantity was made between the parties, in the deed from Trimble's executors, and adopted by Keyton and Brawford: the price by the acre is not stated, but a round sum of 1000 dollars given for this body of unsettled land:— these facts all go to satisfy me, that Keyton took the risk of the purchase on himself. In 1 Call 325. president Pendleton speaking of Quesnel v. Woodlief says, “ the original contract, there, was not in proof, but it is evident to me, that it was for a specific quantity, since the purchase money amounts to 800 acres at £ 4. per acre? The converse of the proposition may not be equally conclusive; but it is persuasive evidence, that a contract was not by the acre, when the purchase money is not an equimultiple of the number of acres. What for instance was the price per acre of this purchase, if the contract was by the acre 1 It would be 5 dollars 83 cents, and thirty-one three hundred and forty-third parts of a cent. If an addition to the tracts described as 325 and 18 acres, he really did get also from Brawford, the 78 acres which have been re-entered, it seems very probable, that he bought the whole of these various claims and *50 interests, such as they were, for the gross and lumping sum 1000 dollars, without any intention of being responsible for excess above the quantity represented in the deed, or any hope of remuneration for deficiency. When to this we add the frame of the bill, which does not go for an alleged deficiency, and the late date at which it was filed, namely, in June 1818, five years after the purchase, we may very well doubt, whether Keyton himself or his heirs ever conceived, that Branford was responsible for a deficiency, or that it was necessary to have a survey of the land, before it could be ascertained what sum would be due for the purchase money. Their objept was to get the land held by M’Knight, or to be paid for the loss of it, as Branford’s deed had comprehended it by mistake: and it is not until after those points are decided against them, that they set up the new (and, I think, incompatible) claim, that this was a contract for a specific quantity of land. I think the decree ought to be afiirmed.
The other jndges .concnrred, Decr.ee afiirmed,